United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Decided January 19, 1997

No. 97-5005

PATRICK J. MAHONEY, REVEREND;
THE CHRISTIAN DEFENSE COALITION,
APPELLANTS

v.

BRUCE BABBITT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR;
NATIONAL PARK SERVICE,
APPELLEES

————-

Appeal from the United States District Court
for the District of Columbia
(No. 96cv02827)

————-

On Emergency Motion for Injunction Pending Appeal
from the Denial of Preliminary Injunction

————-

*James M. Henderson, Sr., Colby M. May,* and *Jay Alan Sekulow* were on the emergency motion for injction pending appeal from the denial of preliminary injunction, for appellants.

*Eric H. Holder, Jr.,* United States Attorney, *R. Craig Lawrence,* and *Marina Utgoff Braswell,* Assistant United States Attorneys were on the opposition to the emergency motion for injunction pending appeal from the denial of preliminary injunction, for appellees.

Before WILLIAMS, SENTELLE and HENDERSON, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*:  This matter came before us pursuant to Rule 8 of the Federal Rules

of Appellate Procedure on appellants' motion for an emergency injunction pending their appeal from

the denial of a preliminary injunction against the Secretary of the Interior and the National Park Service (collectively "NPS" or "the government").  Appellants sought, originally by demonstration permit and later by invoking an exception to the regulations requiring the permit, to demonstrate along the route of the Inaugural Parade in opposition to the policies of President Clinton.  By order filed January 19, 1997, we allowed a portion of the relief sought in the emergency motion for reasons more fully set out below.

I.

Appellants, the Reverend Patrick J. Mahoney and other members of the Christian Defense Coalition ("CDC"), desired to conduct on the sidewalks of Pennsylvania Avenue during President Clinton's second Inaugural Parade, a demonstration protesting against the Clinton Administration's policies toward abortion, particularly his veto of a bill banning partial birth abortions.  In pursuit of that goal, appellants filed an application with NPS, under whose jurisdiction the relevant areas fall, for demonstration permits for three areas, including the section of Pennsylvania Avenue at issue in the present appeal.  NPS regulations specify that "[a]ll demonstration applications ... are deemed granted ... unless denied within 24 hours of receipt."  36 C.F.R. § 7.96(g)(3) (1996).  The NPS did not deny appellants' application and therefore the permit was deemed granted.  However, the same section of the regulations further specifies that "where a permit has been granted, or is deemed to have been granted pursuant to this subsection, the Field Director may revoke that permit pursuant to [36 C.F.R. § 7.96(g)(6)]."  36 C.F.R. § 7.96(g)(3).  The revocation provision incorporates the grounds on which the application originally could have been denied under § 7.96(g)(4)(iii).  That subsection provides, *inter alia,* that an application can be denied where "[a] fully executed prior application for the same time and place has been received," and the permit issued or to be issued in response to that application will authorize activities which do not "reasonably permit multiple occupancy" of the area covered by the permit.  36 C.F.R. § 7.96(g)(4)(iii)(A).  In the instant case, the NPS had previously received applications from itself for the use of the same areas and from the Armed Forces Inaugural Committee.  NPS granted permits based on those two applications and also granted a permit to the Presidential Inaugural Committee, which filed after the appellants an

application for a special event covering the same space. Although NPS granted all three of the other applications, it revoked the application of CDC by letter of December 16, 1996, over the signature of Richard Merryman, the Chief of the Division of Park Programs.

The Merryman letter, as well as an earlier oral warning by NPS counsel Randall Myers, further advised Mahoney, and CDC, that if individual members of CDC or small groups of members followed through on an announced intention to picket in "space[s] assigned to the Presidential Inaugural Committee," those members would be engaged in illegal conduct which "would subject you and your group to potential arrest and fine."

Mahoney and CDC filed the present action in the district court on December 23, 1996, seeking a declaratory judgment and preliminary and permanent injunctive relief against enforcement of the oral and written threats of the defendants to arrest appellants if they displayed signs critical of President Clinton's veto of a bill banning partial birth abortions or of his abortion policies generally on the sidewalks adjacent to the route of the Inaugural Parade along Pennsylvania Avenue. By opinion of January 16, 1997, the district court denied preliminary injunctive relief, even though persons displaying banners supportive of the President were not to be arrested. CDC appealed to us, and by emergency motion pursuant to FED. R. APP. P. 8, sought relief from the denial of a preliminary injunction by way of an injunction pending appeal. As the Inaugural Parade was scheduled for January 20, we considered the motion on an emergency basis and, on January 19, we ordered that the motion be granted in part, to the extent that we ordered that the appellees be "enjoined from arresting or interfering with" individual plaintiffs or groups of twenty-five or fewer[1] such individuals displaying signs critical of the President or his policies except under circumstances in which the same arrests or interference would occur as to "individuals displaying signs not critical of the President or his policies." We further noted in the order that "[a]n opinion more fully explaining the basis" for our ruling would follow. We set that explanation out below.

II.

---

[1] "Demonstrations" of twenty-five or fewer persons do not require permits under applicable regulations. 36 C.F.R. § 7.96(g)(2)(i).

As the amicus American Civil Liberties Union reminded us in the first sentence of its argument, "It is a bedrock principle of First Amendment law that in administering a public forum, the government may not permit speech that expresses one viewpoint while prohibiting speech that expresses the opposite viewpoint." Brief of Amicus Curiae American Civil Liberties Union at 4. As the Supreme Court once stated, "[A government] has no ... authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 392 (1992). Even the more so, the government has no authority to license one side to fight freestyle, while forbidding the other to fight at all. Appellants contend that that is what the government has done to them, and appellants are correct.

It is well established law that "*content-based* restriction on *political speech* in a *public forum* ... must be subjected to the most exacting scrutiny." *Boos v. Barry,* 485 U.S. 312, 321 (1988) (emphasis in original). This requires the regulating government "to show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* (internal quotation and citations omitted). Appellants contend that the government in the present case fell far short of this standard when it first revoked appellants' demonstration permit. Appellants argue that the asserted inconsistency of their use of the sidewalk area with that of the prior and subsequent permittees is a pretext and further that the previous applications did not comply with the regulations and should not have been considered in any event. For example, while the regulations require a "fully executed prior application" as a basis for the denial provisions of 36 C.F.R. § 7.96(g)(4)(iii)(A), NPS's application to itself that was used in the ouster of appellants was incomplete in that it was undated, did not state the maximum number of participants as required by the regulation, and did not state whether equipment would be installed in the area under permit. Furthermore, while the regulations permit a duration of no more than seven days, the NPS application to itself covered the period from November 1, 1996, to April 1, 1997, and presumably would oust appellants from that entire time frame. *See* 36 C.F.R. § 7.96(g)(5)(iv)(A)-(B). Appellants argued that their ouster from the sidewalk area under cover of that less than perfect application was a contrived cover for viewpoint-based discrimination, and that they should have been permitted to participate as a

"reasonably permitt[ed] multiple occupancy" of the area covered by the permits, just as the Armed Forces Inaugural Committee, which filed its application after the NPS but before the appellants, and the Presidential Inaugural Committee, which filed its application after all other applications in the case.

Because of the time constraints of the emergency basis upon which we have entertained this case, and because of the less than fully developed record resulting from the same basis, we have found it neither necessary nor possible to explore this part of appellants' claim. It may be, unless considerations of mootness have intervened, that a later panel at a later date will entertain these arguments; but for now, we simply note their existence and proceed to the further alleged deprivation of First Amendment rights, which we did find it both possible and necessary to remedy on an emergency basis.

III.

The complaint of appellants is that the government wrongfully restricted their First Amendment activities on the basis of the content and viewpoint of their speech when it informed them that any of their number engaging in picketing protesting the Clinton veto of the bill banning partial birth abortions or of his policies more generally would be arrested. Both at the administrative application stage, and in the district court, as well as before us, appellants pointed to 36 C.F.R. § 7.96(g)(2)(i), which specifies that "[d]emonstrations involving 25 persons or fewer may be held without a permit," provided that certain conditions not pertinent to the current controversy are met. Relying on that provision, Mahoney, on behalf of all appellants, stated to representatives of NPS on December 11 that if NPS denied appellants' application, they intended to demonstrate in small groups along the Pennsylvania Avenue parade route. Division Chief Merryman, in a writing dated December 16, 1996, declared, "Engaging in this conduct would be illegal and would subject you and your group to potential arrest and fine." Merryman cited no authority for the proposition that such small group demonstrations would be illegal. Finding none, and suspecting that the government's threat violated their First Amendment rights, appellants filed the present action before the district court.

In its complaint to the district court, CDC alleged and the government did not deny that NPS

counsel Randall Myers advised Mahoney that if a CDC member, even alone, displayed on the public sidewalk of Pennsylvania Avenue a sign depicting a late term abortion, he "would be subject to arrest and fine for demonstrating without a permit if he did so alone or with others."  The complaint further alleged, and the government still did not deny, that Myers had admitted that if instead of carrying graphic posters of late term abortions or signs containing criticisms of the President, Mahoney were to carry signs offering congratulations or best wishes to the President, he would not be subject to arrest for demonstrating without a permit.  Finding it difficult to believe that the government was in fact attempting to defend such a blatant discrimination between viewpoints, we called upon the government for a response.  The government in fact tacitly admitted that it had engaged in precisely the discrimination alleged by appellants and did not retreat from its position on appeal, but instead attempted to justify it.

The government argues, and the district court concluded, that its viewpoint-based discrimination is justified under *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,* 115 S. Ct. 2338 (1995).  As the government's brief put it, "last year a unanimous Supreme Court rejected the contention that a parade organizer may be compelled to include another demonstrator in its event." (Citing *Hurley.*)  The government correctly describes the *Hurley* decision, but the *Hurley* decision has little to do with the present case.  There are two distinctions between *Hurley* and this controversy which are so critical as to make the cases not remotely parallel.  In the first place, the organizer of the parade in *Hurley* was a private group exercising its own First Amendment rights.  In the present case, NPS is the government.  As the Supreme Court recognized in *Hurley,* "[T]he guarantees of free speech and equal protection guard only against encroachment by the government and erect no shield against merely private conduct."  *Id.* at 2344 (internal quotations and citations omitted).  The demonstrators' claim in *Hurley* thus depended upon an argument that the Massachusetts Public Accommodation Law covered participation in parades, a claim rejected by the Court on constitutional grounds.  Appellants in the present case need no such bootstrapping.  Here, their desired First Amendment conduct is barred directly by the government, not by a private party asserting its own First Amendment rights.

We do not mean to suggest that even the government has an obligation to provide a place for all viewpoints in its parade. For example, if the Department of Defense or some other agency of the government were conducting a parade in celebration of the returning veterans of an American war, few would suppose that opponents of the war could successfully demand the right to sponsor units therein. *See DKT Mem'l Fund v. Agency for Int'l Development,* 887 F.2d 275, 289 (D.C. Cir. 1989) (government support of one First Amendment protected activity does not compel government subsidization of another). The would-be demonstrators in the present case are situated as the anti-war demonstrators in the hypothetical.

While NPS might colorably assert that even the government has a right to bar others from events of its particular sponsorship, there is still a second critical distinction between *Hurley* and appellants' case. As the government tacitly admits, the Supreme Court's holding in *Hurley* was that the organizers of a parade could not be compelled to include other demonstrators in their event. The protesting demonstrators in *Hurley* sought to compel the private organizers to allow their participation in the parade. Mahoney and his co-plaintiffs do not seek compulsion or even permission to participate in the Inaugural Parade organized by the Inaugural Committees and other supporters of President Clinton. All they seek is the First Amendment-protected right to stand on the sidewalk and peacefully note their dissent as the parade goes by. Nothing in *Hurley* says that the organizers of the St. Patrick's Day Parade at issue in that case ever tried to prevent their ideological opponents from doing precisely that. No case called to our attention says that anyone has ever successfully established the power of a government to so suppress opposing viewpoints; indeed, in few cases has the government of the United States even tried.

Attempting to offer a prior example of such a successful suppression, the government points to *Sanders v. United States,* 518 F. Supp. 728 (D.D.C. 1981), *aff'd,* 679 F.2d 262 (D.C. Cir. 1982), in which District Judge Smith upheld the arrest of a demonstrator for silently demonstrating with four signs within the Christmas Pageant for Peace on the Ellipse. While of course that district court's decision would not be binding authority upon this court, it is not on point even if it were. In *Sanders,* before deciding that the regulation under which the plaintiff had been arrested was a reasonable time,

place, and manner restriction serving a significant government interest, Judge Smith was at pains to identify what that "case [did] not concern." 518 F. Supp. at 729. He made clear that there was "no allegation of either impermissible discrimination or arbitrariness in the application of [the] policy," and even more tellingly that "there [was] no suggestion that this plaintiff's arrest was in any way based on the content of his views." *Id.* Finally, Judge Smith assured himself that the area to which the prohibition applied did not extend "beyond the immediate area used and needed by the Pageant." *Id.* All of these factors are dramatically and critically opposite to the present case.

In *Sanders* the court found that the reasonable time, place and manner restriction served a significant interest of protecting "the safety, order, and convenience of those other citizens already participating in the preexisting event," 518 F. Supp. at 729. By taking the position that sign-carrying parade viewers would be arrested based not upon their number or placement but upon the content of their signs, however, the government has taken itself outside the realm of permissible time, place, and manner regulation serving legitimate government interests. Indeed, that was the very point in the passage we quoted earlier from *Boos v. Barry.* In *Boos* the Supreme Court, after rejecting the lesser standards applicable to time, place, and manner regulation, subjected content-based restriction on political speech in a public forum, to the "most exacting scrutiny." 485 U.S. at 321. Here, the expressed intention of the government actors to suppress the First Amendment activities of appellants was not only content but viewpoint based. Therefore, as in *Boos,* if we are to uphold this restriction, we will "require[ ] the [government] to show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " 485 U.S. at 321 (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)). The government has not recognized the applicability of the more stringent test applied in *Boos* and has made no real attempt to meet it, nor do we believe it could if it tried.

Lest there be any doubt that the "most exacting scrutiny" standard is the one which applies, we note that the location of the proposed protest, that is the sidewalks of Pennsylvania Avenue, decidedly constitute a public forum. As the Supreme Court has held, it has long been established that " "public places' historically associated with the free exercise of expressive activities, such as streets,

sidewalks, and parks, are considered without more, to be "public forums.' " *United States v. Grace,* 461 U.S. 171, 177 (1983) (citing numerous cases). Nothing more appearing, then, the government here is attempting to ban, on a viewpoint-determined basis, First Amendment activity from a quintessential public forum. Unfortunately for the government, nothing else appears—at least nothing of relevance. Of course, the government granted itself a permit for the sidewalks from which it then sought to ban the "inconsistent" First Amendment-protected activity of CDC. However, there is no authority for the proposition that the government may by fiat take a public forum out of the protection of the First Amendment by behaving as if it were a private actor. Indeed, such authority as exists is directly to the contrary.

In *Henderson v. Lujan,* 964 F.2d 1179, 1181 (D.C. Cir. 1992), a federal agency, in fact NPS, sought to delete a segment of the sidewalks abutting Constitution Avenue from the category of public forum by first declaring those sidewalks to be within the official boundaries of the Viet Nam Memorial and then banning "the sale or distribution of newspapers, leaflets, and pamphlets" in the entire area so designated. We rejected the government's attempt, holding that the sidewalks at issue in that case were "classic instances" of public forum sidewalks. 964 F.2d at 1182. We noted that they were "physically indistinguishable from [other] sidewalks used for the full gamut of urban walking." *Id.* We further concluded that our decision followed from the Supreme Court's decision in *Grace,* which rejected as unconstitutional a ban on picketing and leafletting on the sidewalks abutting the property of the Supreme Court itself, holding that the government could not "transform the character of property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property." 461 U.S. at 180. As the Supreme Court had earlier noted in language perhaps even more pertinent to the present case, the government "may not by its own *ipse dixit* destroy the "public forum' status of streets and parks which have historically been public forums." *United States Postal Service v. Council of Greenburgh Civic Ass'n,* 453 U.S. 114, 133 (1981).

Neither will we permit the government to destroy the public forum character of the sidewalks along Pennsylvania Avenue by the *ipse dixit* act of declaring itself a permittee. We do not purport

to hold that the government can never control the use of segments of its own property against actual inconsistent usage by persons attempting First Amendment expression. In *Grace,* the Supreme Court reiterated its "regular[ ] rejection" of "the assertion that people who wish "to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' " 461 U.S. at 177-78 (quoting *Adderly v. Florida,* 385 U.S. 39, 47-48 (1966)). But the *Grace* Court went on to note, as the *Adderly* Court had previously recognized, that the government's power over the property under its control is to preserve it "for the use to which it is lawfully dedicated." *Id.* By way of example, in *Adderly,* the Court upheld the arrest of demonstrators who would have blocked the necessary flow of traffic in and out of a Florida jail. Here, the dedicated use of the property in question is as a sidewalk—a quintessentially public forum. Its use on the date on which appellants sought to exercise their First Amendment rights was not only as a forum as public as ever, but if anything more so. The event in question was the observance of the inauguration of the Chief Executive of the United States, an event less private than almost anything else conceivable. NPS, however, even more overassertive of its authority and overprotective of the property under its protection than in *Henderson,* issued itself a permit not for a limited segment of the Pennsylvania Avenue sidewalks for the time of the Parade, but for the entire length of Pennsylvania Avenue sidewalks for a five-month period, a time frame more than twenty times as long as permitted under its own regulation. There can be no doubt that the standard of narrow tailoring to meet a compelling state interest applies and has been violated.

That said, the government has offered no compelling governmental interest and no convincing argument that its policy was narrowly crafted to achieve such a legitimate end. Indeed, the only justification offered for barring groups of demonstrators of twenty-five or fewer is that their presence on the Pennsylvania Avenue sidewalks would constitute a "physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs." Government Brief at 12. The goal of the government to prevent that action on appellants' part hardly constitutes a compelling state interest, or, in the face of the First Amendment, any legitimate state interest at all. We may first lay aside the matter of physical intrusion. The government has conceded that if appellants were carrying

no signs or, indeed, if they were carrying signs favorable to the administration whose second Inaugural was being celebrated, their "physical intrusion" would be welcomed. It is only the "purpose of injecting [their] own convictions or beliefs" that causes the government to exclude them. But it is also the appellants' desire to "interject" their own convictions and beliefs that entitles them to the protection of the First Amendment. If the free speech clause of the First Amendment does not protect the right of citizens to "interject" their own convictions and beliefs into a public event on a public forum then it is difficult to understand why the Framers bothered including it all. Although in light of the complete lack of a compelling state interest we find it unnecessary to explore the question of narrow tailoring, it seems unlikely that the government could make a convincing case that it was necessary to issue itself a blocking permit covering the sidewalk for the entire length of Pennsylvania Avenue for a five-month time frame in order to protect the President or the inaugural celebrants from dissenters for a few hours on a single day.[2]

We note briefly one other defense of the government, that is that appellants were granted permits for two other areas on Inauguration Day, areas not on Pennsylvania Avenue and not along the parade route. Appellees have offered us no authority for the proposition that the government may choose for a First Amendment actor what public forums it will use. Indeed, it cannot rightly be said that all such forums are equal. The very fact that the government here struggles to bar the speech it fears or dislikes from one forum while offering, whether freely or grudgingly, access to another belies the proposition of equality. Once before, in *Henderson v. Lujan,* the government argued that leafletters banned from a sidewalk needed no remedy because they had access to other channels of communication, such as other stretches of sidewalk. We declined to discuss that rationale in *Henderson,* as "the ban fails the narrow tailoring requirement in any case." 964 F.2d at 1184. As in

---

[2]The government's attempt to assert a legitimate interest in excluding from the entire area all expression of views "not consistent with [the parade organizers'] message," *see* Appellees' Opposition at p. 10, adds nothing. Such a claim is a viewpoint-based content restriction valueless on its face and inconsistent with such clear Supreme Court doctrine as that reiterated in *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134-35 (1992) ("Speech cannot be ... burdened, any more than it can be punished or banned, simply because it might offend a hostile mob.") (citations omitted). All the more may it not be banned from a public area because it might offend the organizers of a public event.

*Henderson,* so here, and again we will not belabor the government's alternative site theory.

In short, all constitutional authority supports the position we would have thought unremarkable, that a government entity may not exclude from a public forum persons who wish to engage in First Amendment protected activity solely because the government actor fears, dislikes, or disagrees with the opinions of those citizens. None of the authorities offered by the government is to the contrary. Indeed, none is on point.

Factually, one of the closest parallel cases is a decision called to our attention by the amicus ACLU. *Sparrow v. Goodman,* 361 F. Supp. 566 (W.D.N.C. 1973), *aff'd,* 502 F.2d 1326 (4th Cir. 1979). In 1971, then-President Nixon was attending a public function at the Coliseum in Charlotte, North Carolina, in honor of another public figure, the Reverend Dr. Billy Graham. According to the allegations of the plaintiffs in that case, and the findings at the preliminary injunction hearing before the district court, certain federal and local officials excluded persons, principally anti-war demonstrators, because of their use of signs or leaflets critical of the policies of the Administration. Calling that viewpoint-based exclusion a "wholesale assault[ ]" on the "right to freedom of assembly and right to petition for redress of grievances," the district court had no difficulty holding for the plaintiffs. 361 F. Supp. at 585. On appeal, under the name of *Rowley v. MacMillan,* 502 F.2d 1326 (4th Cir. 1974), our sibling circuit affirmed with virtually no discussion of the constitutional issue. While of course, *Sparrow* is not binding upon us, we agree with and adopt its fundamental holding that the government cannot exclude from a public gathering in a public forum on no other basis those citizens whose views it fears or dislikes or prevent their peaceful expression of those views.

## Conclusion

For the reasons set forth above, and as mandated in our prior order, the portion of the district court opinion appealed from, which permitted appellees to bar groups of twenty-five or fewer of appellants from engaging in sign-bearing protests against the policies of the Clinton Administration on the sidewalks of the Pennsylvania Avenue during the second Inaugural Parade, is vacated and reversed.